FILED
SUPERIOR COURT
OF GUAM

2019 JAN 15 PM 4:29

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| THE PEOPLE OF GUAM, | CRIMINAL CASE NO.: CF0701-16 |
| vs. | |
| | DECISION AND ORDER |
| FRED EVERETT MOSER,<br>DOB: 07/05/1963 | (Re: Defendant's Motion to Suppress) |
| DEFENDANT. | |

## INTRODUCTION

This matter came before the Honorable Anita A. Sukola on Fred Everett Moser's ("Defendant") Motion to Suppress. Attorney Curtis C. Van de veld represents the Defendant. Assistant Attorney General Matthew A. Phelps has appeared on behalf of the People of Guam ("People"). Upon review of the oral and written arguments, and legal authorities presented by the Parties, the Court hereby **DENIES** the Defendant's Motion to Suppress.

## BACKGROUND

The Court finds the following facts from the testimony and evidence offered during the Suppression Hearing on August 27, September 4, 5, and 7, and October 3, 2018; and continued for final arguments October 18, 2018. On or about November 29, 2016 at some time near 11:00 p.m.,

then Guam Police Department ("GPD") Field Supervisor and Police Officer III Benny T. Babauta[1] was sitting in his patrol vehicle observing traffic from a stationary position. Officer Babauta was located in the center lane of Route Sixteen and facing south near the Commercial Tire Depot in Barrigada. Officer Babauta testified he took up this position due to the "S" shaped curve in the road in the north-moving lane that allowed him to observe motorists travelling northbound on Route Sixteen before they could see his police vehicle.

While observing traffic, Officer Babauta testified he saw a motorcycle swerving between other vehicles while traveling in the northward lane. He testified that the motorcycle was travelling at a speed greater than the other traffic moving in the same direction. The Defendant was the operator of the motorcycle.

Once the motorcycle passed him, Officer Babauta made a U-turn and followed. The Defendant turned right off of Route Sixteen and onto South Sabana Barrigada Drive. Officer Babauta followed. The Defendant then made a left turn onto Lirio Avenue. Officer Babauta again followed the Defendant onto Lirio Avenue. While on Lirio Avenue, Officer Babauta "paced" the motorcycle from behind by matching the speed of the motorcycle with his police vehicle. Officer Babauta testified his pacing exercise indicated that the Defendant was travelling at approximately twenty-five (25) miles per hour. Officer Babauta stated he understood the speed limit in the residential neighborhood to be fifteen (15) miles per hour. He also testified that because it was late at night, there were vehicles parked on either side of the road. The parked vehicles thus turned the two lane road into a one lane road.[2]

At approximately 11:10 p.m. and while still on Lirio Avenue Officer Babauta activated his emergency lights and sirens from behind the motorcycle. The Defendant complied and pulled the motorcycle over. As the Defendant dismounted, he was facing away from the Officer and police vehicle and was fumbling with a black waist pouch. Officer Babauta described the waist pouch as

---

[1] Officer Babauta was promoted to the rank of Lieutenant in 2017 and was transferred to the Administrative Division.

[2] During direct examination of the Defendant by Counsel for the Defendant, a demonstrative exhibit showed the Defendant driving on Lirio Avenue during the day. Cars parked on both sides of Lirio Avenue during the day also caused the Defendant to slow at several points so oncoming traffic and his vehicle could take turns moving through areas on Lirio Avenue narrowed by parked vehicles.

a pouch that law enforcement officers typically use to carry firearms. At this point, Officer Babauta did not know who the operator was or what he was fumbling with and thus stayed behind the open driver's side door of his police vehicle. Officer Babauta testified that he became concerned for his safety and instead of approaching, he told the Defendant to stop fumbling and to turn and face the police vehicle and Officer Babauta. The Defendant then turned around and held out his Driver's License.

Still behind the door, Officer Babauta instructed the Defendant to approach with his license. The Defendant walked toward Officer Babauta and handed his license over. Officer Babauta noted that the Defendant's movements seemed to be delayed. He also described the Defendant as a big guy. At this point, from where they were situated, Officer Babauta observed a Guam Police Department vehicle heading away from their position in the distance. He recognized that because the police vehicle was a Prius, it was most likely from the Dededo precinct. He radioed to dispatch for the Prius' assistance. Dispatch informed him that the Prius was turning around and heading back to assist. Officer Babauta testified that because he was concerned for his safety, he waited for the Prius to arrive before taking any further action. He remained behind the cover of his vehicle's door and the Defendant was several feet away near his motorcycle and in front of the police vehicle.

When the officer in the Prius arrived, the vehicle pulled alongside Officer Babauta's vehicle. Officer Babauta testified that from his position behind his door, he informed Officer Angel Santos who was driving the Prius of the situation. The Defendant apparently overheard Officer Babauta stating his concern for his safety and his suspicion that the Defendant may be armed. At this point, the Defendant opened his pouch toward the officers attempting to show he was not armed. Officer Babauta testified that from the way the Defendant was opening his pouch, he was not fully opening and was showing only a part of the inside of the pouch.

Officer Babauta testified that he then asked the Defendant whether he had any weapons or anything illegal on him. The Defendant answered in the negative and Officer Babauta then asked for permission to search the pouch. The Defendant then unbuckled the pouch from around his

waist and handed it over. Officer Babauta testified that he searched the pouch for any weapons, and found a Ziploc with a crystalline substance. Officer Babauta further testified that once he saw the Ziploc, he told the Defendant why he stopped him. Officer Babauta also testified that he also suspected that the Defendant was intoxicated at this point because he smelled an odor of an intoxicating beverage emanating from the Defendant. The Defendant allegedly admitted that he had one can of beer earlier in the evening.

At this point, Officer Babauta testified that he read the Defendant his Miranda rights. He then asked for the Defendant's consent to search his backpack, and the Defendant handed Officer Babauta the backpack. Inside the backpack, Officer Babauta discovered a scale and marijuana buds. As a Supervisor, Officer Babauta then radioed for a subordinate officer to handle the matter from that point going forward. Officer A.T. Fejeran arrived at the scene approximately eleven minutes after the traffic stop was initiated. Officer Fejeran subjected the Defendant to a field sobriety test at the scene and then transported the Defendant and the items found in his possession from the scene.

Subsequently, on December 19, 2016, a Superior Court of Guam Grand Jury returned an Indictment charging the Defendant with **POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE WITH INTENT TO DELIVER (As a 1st Degree Felony), POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE (As a 3rd Degree Felony), and POSSESSION OF LESS THAN AN OUNCE OF MARIJUANA (As a Violation).**

The Defendant filed the instant Motion to Suppress on February 13, 2018. The People filed an Opposition on March 14, 2018. A hearing on the Motion to Suppress was delayed first because the Defendant was ill for several months, and then because of scheduling conflicts with Officer Babauta. The Court eventually held a Suppression Hearing on August 27, September 4, 5, and 7, and October 3, 2018. The Court continued the matter for final arguments to October 18, 2018. At the conclusion of the Parties' final arguments, the Court took the matter under advisement.

/ / /

/ / /

## DISCUSSION

In the Motion to Suppress, the Defendant contests Officer Babauta's allegation that he was speeding on Lirio Avenue. Def's Mot. to Suppress 2 (Feb. 13, 2018). Because the Defendant argues he was not speeding, he also argues that when Officer Babauta pulled him over, he was seized in violation of his rights under the Fourth Amendment. Id. at 5. The Defendant also argues that instead of investigating the reason for the traffic stop, Officer Babauta engaged in general search activity. Id. Finally, the Defendant argues that he did not give consent to Officer Babauta to search his waist pouch and therefore the search was unconstitutional. Id. at 5-10. For all these reasons, the Defendant argues that any evidence seized during the traffic stop should be suppressed. Id. at 11.

In opposition to the Motion to Suppress, the People argue that Officer Babauta had reasonable suspicion that the Defendant was speeding, and therefore the initial traffic stop was constitutionally permissible. People's Opp'n to Def's Mot. Suppress 3 (Mar. 14, 2018). The People also argue that some of the authority relied on by the Defendant is outdated and that Officer Babauta was legally allowed to ask certain questions not related to reason for the traffic stop because the questioning did not unreasonably lengthen the stop. Id. at 3-4. The People also argue that the Defendant voluntarily consented to a search of his pouch. Id. at 5. Thus, for these reasons, the People argue that the Defendant's Motion to Suppress should be denied. Id. at 6.

The Parties' arguments raise two distinct issues the Court must address in ruling on the Motion to Suppress. First, the Court must determine whether the initial stop of the Defendant was constitutionally permissible. Second, the Court must determine whether Officer Babauta's search of the Defendant's waist pouch was constitutionally permissible.

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. The Amendment's protections are extended to Guam via the Organic Act of Guam. See 48 U.S.C.A. § 1421b (West 2017). Every seizure or search of a person, or their house, papers, and effects, must be reasonable to be constitutionally permissible. See People v. Chargualaf, 2001 Guam 1 ¶ 14; see also, Pennsylvania v. Mimms, 434 U.S. 106, 108-

109 (1977) (reasoning "[t]he touchstone of [the Court's] analysis under the Fourth Amendment is always reasonableness in all the particular surrounding circumstances of the particular government intrusion of a citizen's personal security."). A search or seizure that is not authorized by a duly issued warrant is presumed unreasonable. Chargualaf, 2001 Guam 1 at ¶ 14 (citing Pennsylvania v. Strickler, 757 A.2d 884, 888 (Pa. 2000)).

      i.      *Whether the seizure of the Defendant was constitutionally permissible.*

When police pull a vehicle over, a seizure occurs for the purposes of the Fourth Amendment. Chargualaf, 2001 Guam 1 at ¶ 17. Vehicle stops implicate the Fourth Amendment because "[a]s with other categories of Fourth Amendment constraints, the reasonableness of such seizures depends on the balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." U.S. v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). Thus, the mere fact that an individual is driving a vehicle and is not in his home does not eliminate his interest in privacy or his right to be free from interference by law enforcement officers. See Delaware v. Prouse, 440 U.S. 648, 662-64 (1979) (reasoning "[a]utomobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets . . . Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed . . . people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles." (internal citations and quotations omitted)).

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a law enforcement officer may seize and conduct a limited pat down of a suspect where the officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous. Terry, 392 U.S. at 31. The exception to the warrant requirement in Terry has been extended to allow police to pull a vehicle over without a warrant "where the police merely have reasonable suspicion

to believe the driver has committed a traffic violation." See Chargualaf, 2001 Guam 1 at ¶ 17 (recognizing that police may pull over a vehicle where they have probable cause to believe a traffic violation has occurred or where they merely have reasonable suspicion to believe the driver has committed a traffic violation); see also, Brignoni-Ponce, 422 U.S. at 881. The Guam Legislature has codified the Terry decision in Guam law at 8 G.C.A. § 30.10 et seq. See People v. Taman, 2013 Guam 22 ¶ 21. The standard for reasonable suspicion is determined from the objective perspective of a reasonable officer with knowledge of the facts and events leading up to the stop. See People v. Mansapit, 2016 Guam 30 ¶ 9 (citing Ornelas v. U.S., 517 U.S. 690, 696 (1996)).

In Chargualaf, the Supreme Court found that a police officer's observation that a vehicle the defendant was operating had a cracked windshield gave the officer probable cause that a traffic violation had occurred and thus the seizure of the Defendant in that matter was constitutionally permissible. Chargualaf, 2001 Guam 1 at ¶ 18.

Here, the Defendant was weaving in and out of traffic on Route Sixteen and going at a speed greater than other traffic heading in the same direction. The Defendant was also travelling at approximately twenty-five (25) miles per hour on Lirio avenue after 11:00 p.m. at night. The street was dark, and cars were parked on either side effectively narrowing the two lane road to one lane. Counsel for the Defendant tried to impeach Officer Babauta by pointing out that there is currently no posted speed limit on either South Sabana Barrigada Drive or on Lirio Avenue.

However, even assuming the Defendant is correct in arguing there was no posted speed limit for South Sabana or Lirio Avenue at the time of the traffic stop in 2016,[3] the Court still finds that a reasonable officer in Officer Babauta's position would have had reasonable suspicion to believe that a traffic violation had occurred. Guam law provides that,

> "[a]ll motor vehicles traveling upon the public highway shall be driven at a careful, prudent rate of speed not greater than nor less than is *reasonable* and proper, having due regard to the . . . *the width of the highway* and *the condition of traffic* upon the highway and all other restrictions and conditions then and there existing."

---

[3] Which the Court does not find at this time, but will assume for argument's sake since the People have not demonstrated that a speed limit was posted in the area on November 29, 2016.

16 G.C.A. § 3301 (*emphasis added*). A motorcycle falls within the definition of motor vehicle under the vehicle code. See 16 G.C.A. §§ 1101(q), (s).

Here, the Court finds the Defendant could have been cited for imprudent driving on Lirio Avenue since he was traveling approximately twenty-five (25) miles per hour on a neighborhood road narrowed to one lane with traffic traveling in both directions. There was also potential for an imprudent driving related violation or warning for the weaving and speeding on Route Sixteen. Therefore, similar to Chargualaf, the Court finds the initial seizure of the Defendant on reasonable suspicion of imprudent driving and/or speeding in violation of 16 G.C.A. § 3301 was reasonable and did not offend the Defendant's right to be free from an unreasonable seizure under the Fourth Amendment.[4]

### ii. *Whether the Defendant voluntarily consented to a search of his waist pouch.*

Having determined that the seizure of the Defendant did not offend the Defendant's rights under the Fourth Amendment, the Court must now determine whether the search of his waist pouch did. When police do not have a warrant to search, police may "lawfully conduct a search or seizure only if an exception to the warrant requirement applies." Chargualaf, 2001 Guam 1 at ¶ 14.

Consent to search is an exception to the warrant requirement. See Chargualaf, 2001 Guam 1 at ¶ 14.[5] Where consent is given during either a lawful encounter or a lawful detention, as

---

[4] The Defendant also cites to Brignoni-Ponce, for the proposition that any questioning during a traffic stop must relate to the purpose of the vehicle stop, while arguing that Officer Babauta did not make any inquiries related to the reason of the traffic stop. However, the Court points out that the actual state of the law is that a police officer may ask questions unrelated to the reason for the traffic stop so long as such questions do not measurably extend the traffic stop. Muehler v. Mena, 544 U.S. 93, 100-01 (2005). The Supreme Court reaffirmed this holding as recently as 2015 in Rodriguez v. U.S., 135 S. Ct. 1609, 1614-15. Thus, the Court rejects the Defendant's argument that Officer Babauta's questions not related to the stop somehow negatively impact his rights under the Fourth Amendment. Here, the entire encounter lasted approximately eleven (11) minutes. Thus, the Court finds the suspected drugs were found in the Defendant's pouch well within the time contemplated for a traffic stop under Guam law.

[5] The Court notes a second exception to the requirement of a warrant to search applies in this case. Terry allows the police to conduct a limited weapons search without a warrant where the police reasonably believe that a person they have detained is armed and presently dangerous. See Terry, 392 U.S. at 27-28. Guam law similarly provides,

> "[w]henever a peace officer authorized to detain any person under the provisions of § 30.10 reasonably believes that a person whom he has detained, or is about to detain, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or another, the peace officer may search such person to the extent necessary to disclose, and for the purpose of

opposed to an illegal seizure, the validity of consent turns on whether it was voluntarily given. Id. at ¶ 15. The government has the burden of proving the consent to the search was voluntary considering the totality of the circumstances. Id. at ¶ 25. The Supreme Court of Guam has listed the following factors that may assist trial courts in determining whether consent to a search is voluntary:

> "(1) Whether the defendant was detained and the length of time of the questioning; (2) whether the defendant was threatened or intimidated by the police; (3) whether the defendant relied on misrepresentations or promises made by the police; (4) whether the person was in custody or under arrest when the consent was given; (5) whether the person was in a public or a secluded place; and (6) whether the defendant objected to the search."

Chargualaf, 2001 Guam 1 at ¶ 25 (citing People v. Santos, 1999 Guam 1 ¶ 36). No one factor is dispositive. See People v. Santos, 1999 Guam 1 ¶ 37 (holding consent was voluntarily given even where several officers had their firearms pointed at the Defendant at the time consent to search was given).

Consent to search is voluntarily given where the defendant is not detained, where there is no evidence of threats, intimidation, misrepresentations or promises by the officer, and where there is no evidence that officers went beyond the scope of consent. See People v. Cundiff, 2006 Guam 12 ¶ 49. In Cundiff officers approached a residence as part of an investigation into a burglary. Id.

---

disclosing the presence of such weapon. If such a search discloses a weapon or any evidence of a criminal offense, it may be seized."

8 G.C.A. § 30.50. The rationale underlying this exception is that allowing the warrantless search is ". . . not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Adams v. Williams, 407 U.S. 143, 146 (1972). This protective search must be "strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993). These types of protective Terry searches have been extended to vehicle interiors during lawful traffic stops in certain circumstances. See e.g, Dickerson, 508 U.S. at 373-74; Michigan v. Long, 463 U.S. 1032, 1049-52 (1983). The Terry protective search has also been found to be constitutionally permissible where police extend the protective search for weapons to a bag carried by a defendant. See e.g., U.S. v. Muhammad, 463 F.3d 115, 122-25 (2d Cir. 2006). Finally, where police discover an item in plain view that they immediately recognize is incriminating, they may seize such item provided that the "intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement." Horton v. California, 496 U.S. 128, 134-35 (1990). This doctrine is referred to as the plain view doctrine. Here, whether by the consent exception or the Terry protective search exception, Officer Babauta discovered the suspected crystal methamphetamine in plain view during a search of the Defendant's pouch. Because Officer Babauta discovered the evidence in plain view while he was within the bounds of at least two exceptions to the warrant requirement, the Court finds neither the discovery nor the seizure of the Ziploc bag of suspected crystal methamphetamine from the Defendant's pouch offends the Fourth Amendment.

at ¶ 6. The officers encountered two individuals and asked if the main suspect in the burglary was in the home. Id. The individuals stated the person was there and the officers asked for consent to enter the home, which they were given. Id. At least one officer entered the home with a shotgun high and aimed where he was facing. Id. After encountering a third individual, the officers requested permission from that individual to search the bedroom he just exited. Id. at ¶ 8. The individual again consented. Id.

The Court considered the issue of whether the consent to enter the home and to search the bedroom were both voluntarily given to the officers. The Court held the consent in both instances was voluntarily given. Id. at ¶¶ 46-50. Weighing the factors, the Court found that there was no evidence that any of the consenting parties were threatened or intimidated by police or that they relied on any kind of misrepresentation or promise from the officers. Id. at ¶ 49. There was also no evidence presented that the individuals objected to the search. Id. Finally, there was no evidence that the officers went beyond the scope of the search. Id. at ¶ 50.

Consent to search is voluntarily given where an officer does not engage in coercive behavior, did not make any representations to the defendant, where the defendant is neither in custody nor under arrest, and where the defendant makes no objection to the search. Chargualaf, 2001 Guam 1 at ¶ 27. In Chargualaf the Defendant was pulled over for a traffic violation. Id. at ¶ 3. The Defendant gave his consent and a firearm was found during the stop, while drugs and other evidence were seized from a passenger. Id. at ¶¶ 4-5.

The Court considered *inter alia* whether the Defendant voluntarily consented to a search of his vehicle. The Court found the Defendant voluntarily gave consent. Id. at ¶ 28. The Court emphasized that the Defendant was not detained. Id. at ¶ 27. The Court also emphasized that the Defendant was only questioned for a brief period before the request to search was made. Id. The Court reasoned there was no evidence of coercive behavior or questioning or that the officer made any misrepresentations regarding the search. Id. The Court further reasoned that the Defendant was not in custody when request for consent to search was made. Id. Finally, the Court reasoned that the Defendant did not object to the search and even verified the consent to a second officer. Id.

At least one court has found that simply placing a hand on a firearm when requesting consent to search, and where the request is secluded, are together sufficient to render consent involuntary. See U.S. v. Chan-Jimenez, 125 F.3d 1324, 1327-28 (9th Cir. 1997) (holding consent involuntary where an officer had a hand on his firearm throughout a traffic stop and when he asked for consent to search because the firearm implicitly demonstrated authority and that the defendant had no choice but to consent to the search).

Here, as in Chargualaf and Cundiff, there was no evidence presented that Officer Babauta engaged in any coercive or intimidating behavior. Further, there was no testimony that the Defendant relied on any misrepresentation or promise regarding the search made by Officer Babauta. The search occurred in a public place and the Defendant did not object to the search. The Defendant was also not under arrest when he was asked for consent to search. The only factor that would weigh against a finding of voluntariness would be the fact that Officer Babauta had a hand on his firearm at or near the moment when he requested permission to search. However, unlike Chan-Jimenez, the encounter between the Defendant and Officer Babauta was not in a secluded place. Additionally, the Guam Supreme Court recognized in 1999, and after Chan-Jimenez was decided, that even where several firearms are drawn and pointed at a Defendant at the time consent is requested, that alone does not negate the voluntariness of such consent. See Santos, 1999 Guam 1 ¶ 37.[6]

Here, the Court finds that Officer Babauta's hand on his firearm at or near the time consent was requested is not dispositive to the Court's voluntariness analysis. Instead, like in Chargualaf and Cundiff, the Court finds that the factors and by extension the totality of the circumstances demonstrate that Officer Babauta neither coerced nor used an implicit or explicit show of authority to attain the Defendant's consent to search his waist pouch. Rather, the Defendant voluntarily consented to the search at the request of Officer Babauta. Therefore, the search falls within the consent exception to the warrant requirement and the Court finds no constitutional violation.

---

[6] Notably, the Guam Supreme Court cited to Chan-Jimenez in the Santos opinion. See Santos, 1999 Guam 1 at ¶ 39.

The Court finds there was no constitutional violation in the seizure of the Defendant, or the search and discovery of suspected contraband in his waist pouch. Therefore, the Defendant's Motion to Suppress is hereby **DENIED**.[7]

## CONCLUSION

By preponderance of the evidence and for the foregoing reasons, the Court hereby **DENIES** the Defendant's Motion to Suppress.

A **Criminal Trial Setting** is set for _____2/11/19_____ at **9:00 a.m.**

SO ORDERED ___1/15/19_____.

_____
The Honorable Anita A. Sukola
Judge, Superior Court of Guam

SERVICE VIA COURT BOX
I acknowledge ... the
original he... ...ed in the
court box o:

Date: 1/15/19 Time: 4:45

**Rosalind C. Balajadia**
Deputy Clerk, Superior Court of Guam

[7] Once Officer Babauta discovered the suspected controlled substance in the Defendant's waist pouch, the Officer had probable cause to arrest for possession of a controlled substance. Thus, the Court finds that the items seized during a search of the backpack found on the Defendant's person are not the product of an unlawful search or seizure. Therefore, the Court rejects the Defendant's argument that such items should be suppressed as the fruits of an unlawful search. Def's Mot. to Suppress 11 (Feb. 13, 2018).